805 S.E.2d 212

Lisa MCKAUGHAN, Individually and as the
Personal Representative of the Estate
of William Farr, Appellant,

v.

UPSTATE LUNG AND CRITICAL CARE SPECIALISTS,
P.C. and Sau-Yin Wan, M.D., Respondents.

Appellate Case No. 2015-001828
Opinion No. 5515

Court of Appeals of South Carolina.

Heard February 15, 2017
Filed September 14, 2017
Rehearing Denied October 19, 2017

---

Jordan Christopher Calloway, of McGowan Hood & Felder, LLC, of Rock Hill, for Appellant.

Andrew F. Lindemann, of Davidson & Lindemann, PA, of Columbia; and Ashby W. Davis and David Lee Williford, II, both of Davis, Snyder, Williford & Lehn, P.A., of Greenville, for Respondents.

LOCKEMY, C.J.:

In this medical malpractice action, Lisa McKaughan, individually and as personal representative of the estate of her father, William Farr, alleges the circuit court erred by directing a verdict in favor of Critical Care Specialists and Dr. Sau-Yin Wan (collectively Respondents). McKaughan also alleges the circuit court improperly excluded the testimony of her expert as unreliable. We reverse.

## FACTS

On January 11, 2010, Dr. Sau-Yin Wan, a pulmonologist, examined William Farr, a lifelong smoker with complaints of trouble breathing. During Dr. Wan's examination, she ordered a chest x-ray. Dr. Wan interpreted the x-ray herself and determined Mr. Farr suffered from hyperinflation, meaning there was too much air in Mr. Farr's lungs. Dr. Wan specifically looked for nodules in the lungs, which would signal cancer, but did not find any. Dr. Wan diagnosed Farr with dyspnea, COPD, nondependent tobacco use disorder, and hypoxemia. None of these diagnoses indicated the presence of cancer. Dr. Wan recommended Farr stop smoking and instructed him to return to the clinic in six months in order to determine if he stopped smoking. Mr. Farr did not return for his follow-up appointment.

Following his initial consultation with Dr. Wan, Farr had continuing trouble breathing. McKaughan scheduled an appointment for her father to see Dr. Ronald Littlefield on October 6, 2010. On October 7, 2010, Dr. Littlefield ordered an x-ray of Farr's chest. The x-ray showed a large mass in Farr's right lung. Dr. Littlefield referred Farr to the Lung and Chest Medical Associates for further evaluation.

Eventually, doctors diagnosed Farr with a nine-centimeter primary lung cancer in his right lung. Doctors removed Farr's cancer in December 2010, and he began chemotherapy and radiation after the surgery.

Farr subsequently developed a tumor in his left lung in August 2011. Doctors biopsied the tumor and found it was cancerous in April 2012. Doctors diagnosed him with stage four lung cancer, with a three to six month prognosis. Farr died on June 19, 2012. His death certificate lists metastatic lung cancer as the cause of death.

McKaughan filed a lawsuit on May 30, 2013 against Respondents alleging medical malpractice in their care of her father. She alleged Respondents caused her father's death by failing to diagnose his lung cancer during the January 2010 appointment. The case proceeded to trial on July 27-29, 2015. After McKaughan presented her case, Respondents requested the trial court direct a verdict in their favor. Respondents alleged McKaughan failed to present sufficient evidence of a breach of a standard of care or that any breach caused Farr's death. The trial court denied Respondents' motion on the standard of care issue, but granted their motion because it did not believe McKaughan presented sufficient evidence of causation. The trial court found McKaughan failed to present evidence of how the cancer metastasized from the right lung to the left lung, meaning the jury would have to speculate as to the method of metastasis. This appeal followed.

## STANDARD OF REVIEW

"When reviewing a trial court's ruling on a directed verdict motion, this court will reverse if no evidence supports the trial court's decision or the ruling is controlled by an error of law." *Burnett v. Family Kingdom, Inc.*, 387 S.C. 183, 188, 691 S.E.2d 170, 173 (Ct. App. 2010). "When reviewing the trial court's decision on a motion for directed verdict, this court must employ the same standard as the trial court by viewing the evidence and all reasonable inferences in the light most favorable to the nonmoving party." *Id.* "The trial court must deny a directed verdict motion where the evidence yields more than one inference or its inference is in doubt." *Id.*

## LAW/ANALYSIS

A medical malpractice plaintiff must prove, by a preponderance of the evidence:

(1) The presence of a doctor-patient relationship between the parties;

(2) Recognized and generally accepted standards, practices and procedures which are exercised by competent physicians in the same branch of medicine under similar circumstances;

(3) The medical or health professional's negligence, deviating from generally accepted standards, practices, and procedures;

(4) Such negligence being the proximate cause of the plaintiff's injury; and

(5) An injury to the plaintiff.

*Jamison v. Hilton*, 413 S.C. 133, 140-41, 775 S.E.2d 58, 62 (Ct. App. 2015) (quoting *Brouwer v. Sisters of Charity Providence Hosps.*, 409 S.C. 514, 521, 763 S.E.2d 200, 203 (2014)).

 "When one relies solely upon the opinion of medical experts to establish a causal connection between the alleged negligence and the injury, the experts must, with reasonable certainty, state that in their professional opinion, the injuries complained of most probably resulted from the defendant's negligence." *Id.* at 141, 775 S.E.2d at 62 (quoting *Hoard ex rel. Hoard v. Roper Hosp.*, 387 S.C. 539, 546, 694 S.E.2d 1, 5 (2010)). "The reason for this rule is the highly technical nature of malpractice litigation." *Ellis v. Oliver*, 323 S.C. 121, 125, 473 S.E.2d 793, 795 (1996). "When expert testimony is the only evidence of proximate cause relied upon, the testimony must provide a significant causal link between the alleged negligence and the plaintiff's injuries, rather than a tenuous and hypothetical connection." *Hilton*, 413 S.C. at 141, 775 S.E.2d at 62 (quoting *Hoard*, 387 S.C. at 546-47, 694 S.E.2d at 5). "Only on the rarest occasion should the trial court determine the issue of proximate cause as a matter of law." *Burnett*, 387 S.C. at 191, 691 S.E.2d at 175.

Dr. Barry Singer, an expert in medical oncology and hematology, examined Farr's medical records and testified those records indicate the right lung tumor was a stage 2B lung cancer with no metastases. Singer testified the right lung cancer was a bronchoalveolar type adenocarcinoma. According to Singer, adenocarcinoma means a tumor that develops in the glands. Specifically, Singer stated the cancer was adenocarcinoma with papillary features.

Singer's review of the pathology report compiled after Farr's 2010 surgery indicated the right lung cancer was 9x8.5x5 centimeters. Singer described the tumor as "quite large." Singer testified the tumor was likely two to three centimeters in size in January 2010.

Singer testified the larger a tumor is, the more likely it is to have spread. According to Singer, "as cancer grows, cells break off all the time. The body's immune system is able to generally prevent them taking hold and growing [what] we call a metastasis, but the more surface area, the more area cells [have] to break off." Singer asserted the prognosis for a larger tumor is no different from a small tumor "until the actual metastasis occurred. When a recurrence occurs, then the patient, in lung cancer, generally is going to die." Singer testified his recommended treatment for Farr's cancer would not have included chemotherapy and radiation had it been discovered in January 2010 instead of October 2010. Singer testified it was his opinion that, more likely than not, had Farr's cancer been diagnosed in January 2010, Farr would have survived the cancer.

Singer stated he believed Farr's cancer metastasized from the right lung to the left lung. Singer noted the tumor cells that were removed from Farr's right lung were within one millimeter of the resection, meaning "there's a great risk that cells may have been left after the surgery." Singer opined these close margins were the reason for Farr's chemotherapy and radiation following surgery, to ensure any cells that were left were destroyed.

Singer explained the tumor on Farr's left lung was also an adenocarcinoma, but with primarily lepidic and acinar patterns. According to Singer, "as an adenocarcinoma, knowing they can have a multitude of variance in terms of appearance, that it's, to me, it would, 95 percent of the time be the same cancer" as the right lung. Singer stated the tumors contain the same cells, but different types of cells were predominate. Singer testified he would expect to see a metastasis in primary lung cancer within one-and-a-half to two years.

Singer did not find the difference between the papillary primary cancer in the right lung and the lepidic and acinar patterns in the left lung extraordinary. Singer testified that cancers are not uniform and "metastases in primaries don't often have the exact same histology." Singer further opined, "[The primary] may be predominance of one type and then metastasis [sic] because that's the most aggressive form of the tumor versus the primary." Singer testified, to a reasonable

degree of medical certainty, Farr's cancer spread from his right lung to his left lung.

On cross-examination, Singer acknowledged the surgeons checked the margins around the tumor for signs of cancer cells and did not find any. The surgeons also looked at the lung itself for further signs of cancer, but did not discover any. Singer acknowledged that lymph nodes taken during the surgery tested negative for cancer cells, and there did not appear to be any vascular involvement. Singer also recognized Farr continued to smoke following his surgery. Finally, Singer acknowledged that if Farr did not die of the right lung cancer, and the right lung cancer did not spread to the left, but the left cancer was in fact a new cancer, Respondents would not be responsible for his death.

On redirect, Singer testified he has seen several thousand patients with lung cancer during his career. Singer stated a patient can have a metastasis with negative margins and no lymph node involvement. According to Singer, surgical resection does not remove every cancer cell from a patient, and "even in patients with pathologic Stage, Stage 1 lung cancer, where every node is negative and every margin is negative, 30 percent die because they have metastatic disease that turns up within a year or two." Singer testified, in his opinion, it is more likely than not that Farr was part of the 30 percent who die without lymph node involvement.

At the close of McKaughan's case, Respondents moved for a directed verdict, arguing she had not introduced any evidence of how the cancer metastasized from the right lung to the left. Respondents argued McKaughan's failure to prove a method of metastasis constituted a failure to prove causation.

McKaughan argued she does not have to prove the mechanism of spread, only that the tumor did in fact spread. McKaughan noted, "A lot of times, in a cancer spread, Your Honor, there is no evidence" of how the cancer spread.

The trial court detailed its belief that McKaughan had the responsibility to prove how the cancer got from one lung to the other. The trial court stated, "I'm just not convinced that it's enough for a doctor to come in and look at the end result and say okay, this cancer's the same as the other cancer, it met—it metastasized and not say well, how did it—that hap-

pen." McKaughan again asserted, "How something happens is not our burden." Respondents again asserted McKaughan must prove the method by which the cancer metastasized in order to prove causation.

The trial court found McKaughan had not presented sufficient evidence to prove how the cancer metastasized from one lung to the other. The trial court then granted Respondents' motion for directed verdict, reasoning that allowing the jury to deliver a verdict in this case would require them to "engage in improper speculation in [determining] how this cancer got from one side to the other."

■ We find the trial court imposed too high a burden on McKaughan to prove how the cancer spread from one lung to the other. In this highly technical field, where there may not be clear markers indicating by what method a cancer spreads, it was an error of law to direct a verdict in favor of Respondents because Dr. Singer did not definitively indicate by what method the cancer metastasized. *See Hilton*, 413 S.C. at 141, 775 S.E.2d at 62 ("When expert testimony is the only evidence of proximate cause relied upon, the testimony must provide a significant causal link between the alleged negligence and the plaintiff's injuries, rather than a tenuous and hypothetical connection." (quoting *Hoard*, 387 S.C. at 546-47, 694 S.E.2d at 5)). If a plaintiff presents an expert who testifies, to a reasonable degree of medical certainty, and with supporting scientific evidence, that the plaintiff's cancer is a metastasis, the plaintiff has met its burden to overcome a directed verdict.

Under this standard, we believe Singer presented sufficient evidence for the jury to determine that Farr's cancer metastasized from his right lung to his left lung. *Burnett*, 387 S.C. at 188, 691 S.E.2d at 173 ("The trial court must deny a directed verdict motion where the evidence yields more than one inference or its inference is in doubt."). Singer's testimony indicates his professional opinion that the cancer in Farr's right lung metastasized to his left lung, even though the margins surrounding the tumor and the lymph nodes were negative for cancer cells. Singer noted cancer cells were found within one millimeter of the edge of the lung resection following the 2010 surgery. According to Singer, these close margins indicated "there's a great risk that cells may have been left

after the surgery." Further, Singer testified surgical resections do not remove all cancer cells, and 30% of patients with negative margins and no lymph node involvement subsequently have a recurrence of cancer. Based on his experience, Singer testified he was 95% sure the adenocarcinoma in Farr's left lung was the same adenocarcinoma from Farr's right lung, based in part on when the second tumor appeared. We believe Singer's testimony alone provided a basis by which the jury could have found the cancer metastasized from the right lung to the left lung. This evidence was sufficient to overcome Respondent's motion for a directed verdict.[1]

## CONCLUSION

Accordingly, the decision of the trial court is

**REVERSED.**

HUFF and THOMAS, J.J., concur.

---

1. Because we reverse the trial court's order granting Respondents' motion for a directed verdict, we decline to address McKaughan's arguments regarding expert testimony that was excluded as unreliable. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (ruling an appellate court need not review remaining issues when its determination of a prior issue is dispositive of the appeal).